FOR PUBLICATION

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT; CENTER FOR BIOLOGICAL DIVERSITY; FRIENDS OF THE CLEARWATER; WILDEARTH GUARDIANS; PREDATOR DEFENSE, <br><br>    *Plaintiffs-Appellants,* <br><br> v. <br><br> TODD GRIMM, Idaho Director, Wildlife Services; USDA WILDLIFE SERVICES, <br><br>    *Defendants-Appellees.* | No. 18-35075 <br><br> D.C. No. 1:16-cv-00218- EJL-CWD <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted March 4, 2019
Portland, Oregon

Filed April 23, 2019

Before: Susan P. Graber and Marsha S. Berzon, Circuit Judges, and John R. Tunheim,[*] Chief District Judge.

Opinion by Chief District Judge Tunheim

## SUMMARY[**]

### Environmental Law / Article III Standing

The panel reversed the district court's dismissal for lack of Article III standing of an action brought by plaintiff conservationist groups to enjoin the federal government's participation in the killing of gray wolves in Idaho pending additional analysis under the National Environmental Policy Act.

The panel analyzed the requirements of Article III standing that plaintiffs had the burden of establishing.

First, the panel held that eight declarations from plaintiffs' members describing how USDA Wildlife Services' wolf-killing activities threatened their aesthetic and recreational interests in tracking and observing wolves in the wild fell under the scope of NEPA's protections, and established injury-in-fact.

---

[*] The Honorable John R. Tunheim, Chief United States District Judge for the District of Minnesota, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Second, the panel noted that causation was established under the relaxed standard for procedural injuries.

Third, the panel held that the district court erred in finding that plaintiffs' injuries were not redressable, and in relying on *Goat Ranchers of Or. v. Williams*, 379 F. App'x 662 (9th Cir. 2010), which was unpublished and therefore lacked precedential value, and which was distinguishable on the facts. The panel held that the proper inquiry was whether plaintiffs had shown that halting Wildlife Services' wolf-killing activities pending additional NEPA analysis could protect their aesthetic and recreational interests in gray wolves in Idaho. The panel held that plaintiffs had shown this. The panel remanded for further proceedings.

**COUNSEL**

Talasi Brooks (argued) and Lauren M. Rule, Advocates for the West, Boise, Idaho; Kristin F. Ruether, Western Watersheds Project, Boise, Idaho; for Plaintiffs-Appellants.

Kevin W. McArdle (argued), Andrew C. Mergen, Joan Pepin, Shaun M. Pettigrew, and John P. Tustin, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Lisa Jabaily and Leah C. Battaglioli, Trial Attorneys, Marketing, Regulatory, and Food Safety Programs Division, Office of the General Counsel, United States Department of Agriculture, Washington, D.C.; for Defendants-Appellees.

## OPINION

TUNHEIM, Chief District Judge

Conservationist Plaintiffs brought this action to enjoin the federal government's participation in the killing of gray wolves in Idaho pending additional analysis under the National Environmental Policy Act of 1969 ("NEPA"). Plaintiffs allege that Defendants Grimm and Wildlife Services (together, "Wildlife Services"), a component of the U.S. Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS"), violated NEPA by failing to prepare an Environmental Impact Statement ("EIS") on their wolf management activities in Idaho. The district court dismissed Plaintiffs' action for lack of Article III standing, holding that Plaintiffs had not shown that their injuries were redressable because Idaho could engage in the same lethal wolf management operations without the help of the federal government. Plaintiffs appeal. For the reasons below, we reverse and remand.

## I. BACKGROUND

### A. National Environmental Policy Act

NEPA "is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). Accordingly, NEPA requires federal agencies to assess and publicly disclose the environmental impacts of proposed federal actions. *See* 42 U.S.C. §§ 4321–4370m-12. Where a "major federal action" will "significantly affect[] the quality of the human environment," 42 U.S.C. § 4332(C), or "there are substantial questions about whether a project *may* cause significant degradation of the human environment,"

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (emphasis in original), an agency is required to prepare an EIS. Where the environmental consequences of a proposed federal action are unclear, an agency must prepare an environmental assessment ("EA") to determine whether an EIS is necessary. 40 C.F.R. § 1501.4(b). If an agency completes an EA and determines that an EIS is unnecessary, it must issue a "finding of no significant impact" ("FONSI") explaining its decision. *Id.* § 1501.4(e).

An agency must supplement a draft or final EIS if: "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* § 1502.9(c)(1).

When reviewing an agency's decision not to prepare an EIS, we consider whether the decision was arbitrary and capricious. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).

**B. Gray Wolf Management in Idaho**

Historically, the Northern Rocky Mountain ("NRM") gray wolf inhabited mountainous portions of Idaho, Montana, and Wyoming. Its population decreased drastically with increased human activity and, in 1974, the U.S. Fish and Wildlife Service ("FWS") listed the NRM gray wolf as endangered under the Endangered Species Act of 1973 ("ESA").

FWS was responsible for managing the NRM gray wolf population while it was listed under the ESA. In 1994, FWS reintroduced NRM gray wolves into central Idaho. Its goal

was to help the NRM gray wolf reach a population of thirty breeding pairs across the listed NRM range. Anticipating potential wolf-human conflicts brought on by the reintroduction, FWS authorized the killing or removal of wolves identified as having preyed on livestock or other domestic animals. Where authorized by FWS, Wildlife Services assisted livestock owners with those efforts.

The NRM gray wolf population grew steadily under FWS management. By 2000, FWS estimated that the population had reached the stated goal of thirty breeding pairs. In 2002, the Idaho Department of Fish and Game ("IDFG") prepared a plan describing Idaho's goals and strategies for wolf management. IDFG prepared the plan anticipating that NRM gray wolves would eventually be delisted under the ESA, which would shift wolf management responsibilities to state governments.

After a series of failed delisting attempts, the NRM gray wolf was successfully delisted in 2011 following a directive from Congress. *See All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1171–72 (9th Cir. 2012). Since the 2011 delisting, IDFG has maintained responsibility for managing gray wolves in Idaho. IDFG manages wolves in accordance with the 2002 plan and an Elk Management Plan developed in 2014. Together, these plans address wolf predation on livestock, domestic animals, and ungulates.

IDFG relies primarily on sport hunting to meet its wolf management objectives, with harvest numbers ranging from 200 to 356 wolves annually since 2011. Where sport hunting is insufficient, IDFG requests assistance from Wildlife Services. Once Wildlife Services receives a request, it enjoys considerable discretion in determining whether a problem complained of was caused by wolves and, if so, how to address it. Wildlife Services may use lethal or non-lethal

methods to target and address depredating wolf packs or individuals. IDFG pays Wildlife Services with funds allocated from its Wolf Depredation Control Board, which was established in 2014.

From 2011 to 2015, between forty-two and eighty wolves were killed annually by Wildlife Services or livestock producers to address livestock depredation. During that time, Wildlife Services also killed between zero and twenty-three wolves per year to protect ungulates in Idaho's Lolo elk zone, an area identified by IDFG as a critical habitat for its elk population. Wildlife Services killed wolves in the Lolo elk zone during aerial shooting operations, sometimes removing entire packs in one strike. Aerial shooting is considered a highly effective wolf management technique but requires special expertise and equipment to be conducted effectively. IDFG independently killed fourteen wolves in 2013 to benefit prey species but did not independently kill wolves in other years. It is not clear whether IDFG has ever carried out an aerial shooting operation.

IDFG has stated that, in the absence of assistance from Wildlife Services, it would conduct its own wolf removal operations for the purpose of protecting ungulates. IDFG has not provided details regarding to what extent, if any, it would conduct wolf management operations for the purpose of protecting livestock or domestic animals, whether it would attempt to kill the same number of wolves, or what management methods it would employ should Wildlife Services withdraw its assistance. Instead, IDFG has made general statements about its "independent capabilities to perform wildlife control activities" and cited agreements with independent contractors that it "has used and may use to perform lethal wolf control."

### C. Wildlife Services' EA and FONSI

Following public comment, in 2011, Wildlife Services issued an EA and FONSI discussing its future involvement with gray wolf management in Idaho. Among other alternatives, Wildlife Services considered limiting its activities to nonlethal control efforts or declining to provide any assistance whatsoever. In its commentary, Wildlife Services remarked that the effectiveness of alternatives wherein it did not offer lethal control would "depend largely on whether the USFWS or IDFG, as appropriate, were able to establish an equally prompt and effective wolf damage management program in the absence of [Wildlife Services]" and that, "in the mean-time, implementation of both lethal and nonlethal methods by other entities would likely not be as effective as when carried out with the assistance of [Wildlife Services]."

Ultimately, Wildlife Services chose "Alternative 2," under which it would continue to assist FWS—or, once NRM wolves were delisted, IDFG—with wolf management for the purpose of livestock protection and would provide additional assistance for the purpose of ungulate protection. Because Wildlife Services determined that Alternative 2 would not have a significant environmental impact, it did not prepare an EIS. However, it stated that it would continue to monitor its wolf management efforts in Idaho based on several factors, including effects on wolf population, risks to non-target species, impacts on public health and safety, humaneness, and sociological issues.

Shortly after Wildlife Services issued the EA and FONSI, the NRM gray wolf was delisted, allowing IDFG to assume management over gray wolves in Idaho. Despite the changes that accompanied and followed that shift—including the legalization of sport hunting, changes to

IDFG's wolf management plans, and the release of new research—Wildlife Services determined each year from 2011 to 2015 that supplementation of its 2011 NEPA analysis was unnecessary.

## D. Procedural History

Plaintiffs are five environmental advocacy groups that work and have members in Idaho. They brought this action against Wildlife Services in June 2016 in the United States District Court for the District of Idaho. Plaintiffs brought four Claims: (I) NEPA Violation—Failure to prepare an EIS; (II) NEPA Violation—Failure to take a hard look at the effects of actions and alternatives; (III) NEPA Violations—Decisions not to supplement NEPA analysis as arbitrary and capricious, 5 U.S.C. § 706(2)(A); and (IV) NEPA Violation—Failure to supplement the 2011 EA as an action unlawfully withheld or unreasonably delayed, *id.* § 701(1). They seek to enjoin Wildlife Services from continuing its wolf-killing activities until it undergoes additional NEPA analysis.

Plaintiffs and Wildlife Services filed cross-motions for summary judgment. The district court granted summary judgment for Wildlife Services, holding that Plaintiffs lack Article III standing. The district court found that, even if Wildlife Services were ordered to halt its wolf-killing activities pending an updated NEPA analysis, Plaintiffs had not shown that IDFG would not fill in and kill the same number of wolves. Because of this finding, the court held that Plaintiffs' injuries were not redressable.

## II. DISCUSSION

We review questions of standing de novo. *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 794 & n.2 (9th Cir.

10      WESTERN WATERSHEDS PROJECT V. GRIMM

2013).  A plaintiff has the burden of establishing Article III standing.  *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008).  A plaintiff seeking to establish standing must show that:  "(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

The only requirement in dispute here is redressability.  However, because redressability is influenced by the scope of Plaintiffs' injury, we turn first to that requirement.

**A.  Injury**

Where a plaintiff alleges a procedural injury—such as a NEPA violation—the plaintiff "must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011)).  Environmental plaintiffs may establish injury-in-fact by demonstrating that "they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000)).

Plaintiffs submitted eight declarations from their members describing how Wildlife Services' wolf-killing activities threaten their aesthetic and recreational interests in tracking and observing wolves in the wild, often in specific regions.  For instance, one member described how his life-long love of wolves has led him to track and observe them

in the Idaho wilderness. Having been fortunate enough to spot wolves or hear them howl on several occasions, he is able to identify certain individuals and packs. He plans to continue to track wolves throughout Idaho. On one occasion, he personally witnessed Wildlife Services shooting an entire wolf pack during an aerial killing operation. He and other members also describe their interests in enjoying the wildlife and ecosystems of Idaho, which may be threatened by the ripple effects of wolf mortality or changes in behavior caused by wolf killings. These interests fall under the scope of NEPA's protections and establish injury-in-fact.

## B. Redressability[1]

The district court held that Plaintiffs' injuries were not redressable, finding that Plaintiffs had not shown that halting Wildlife Services' wolf management activities in Idaho pending further NEPA analysis would result in fewer wolf killings or more wolves being present in Idaho for Plaintiffs' enjoyment. In so holding, the district court relied on *Goat Ranchers of Or. v. Williams*, 379 F. App'x 662 (9th Cir. 2010) (unpublished). There, we held that the plaintiffs challenging Wildlife Services' participation in Oregon's state-funded cougar management plan had not shown that their injuries were redressable because Oregon would likely continue to kill and trap the same number of cougars without Wildlife Services' assistance. *Id.* at 663–64.

---

[1] Causation is not at issue here. However, because standing is a constitutional requirement, we note that Plaintiffs' injury—reduced aesthetic and recreational enjoyment of wolves in Idaho—is "not too tenuously connected" to Wildlife Services' alleged NEPA violation, thus establishing causation under the relaxed standard for procedural injuries. *Salmon Spawning*, 545 F.3d at 1229.

12   WESTERN WATERSHEDS PROJECT V. GRIMM

The district court erred by relying on *Goat Ranchers*. That case is unpublished and lacks precedential value. 9th Cir. R. 36-3(a). Additionally, *Goat Ranchers* and the present case are significantly different factually. For instance, unlike IDFG, Oregon made clear that it would continue to remove cougars in each area it selected as a target, with or without the participation or assistance of Wildlife Services. Finally, in relying on *Goat Ranchers*, the district court failed to properly apply the relaxed standard for redressability in procedural injury cases. We turn now to that standard.

To establish redressability, "[p]laintiffs alleging procedural injury 'must show only that they have a procedural right that, if exercised, *could* protect their concrete interests.'" *Salmon Spawning*, 545 F.3d at 1226 (quoting *Defs. of Wildlife v. EPA*, 420 F.3d 946, 957 (9th Cir. 2005), *overruled on other grounds by Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007)). Thus, the proper inquiry here is whether Plaintiffs have shown that halting Wildlife Services' wolf-killing activities pending additional NEPA analysis could protect their aesthetic and recreational interests in gray wolves in Idaho. We hold that they have.

If Wildlife Services were to cease its activities—even temporarily—it is possible that fewer wolves would be killed, particularly in the short term. Wildlife Services itself has stated that, without its assistance, "implementation of both lethal and nonlethal [wolf management] methods by other entities would likely not be as effective." Likewise, additional NEPA analysis could change Wildlife Services' activities in the long term. Among other possibilities, Wildlife Services could decide, in its discretion, to kill fewer wolves or to use only non-lethal means of wolf management moving forward. Any of these outcomes would protect

Plaintiffs' interests. "That it is uncertain whether [additional analysis] will ultimately benefit the groups . . . does not undermine their standing." *Salmon Spawning*, 545 F.3d at 1229.

Nevertheless, Wildlife Services argues that, without it, IDFG could—and would—exercise its independent authority to meet its wolf management objectives, thus defeating redressability. On this point, our opinion in *WildEarth Guardians* is instructive. In that case, the plaintiff brought NEPA claims against APHIS, challenging its participation in Nevada's predator management program. *WildEarth Guardians*, 795 F.3d at 1153. APHIS and Nevada shared responsibility for the program, with both entities contributing funding and personnel. *Id.* at 1152. APHIS argued that the plaintiff's injuries were not redressable because, without federal involvement, "Nevada would pick up where the federal government left off." *Id.* at 1156–57. In support of its argument, APHIS pointed to Nevada's independent authority to manage predators, its existing participation in predator control activities, and a single statement by a Nevada official expressing the state's intent to develop an independent program absent APHIS's participation. *Id.*

We held that the plaintiff's procedural injuries were redressable. *Id.* at 1156. We noted that although the Nevada Department of Wildlife had stated that it would implement a predator management program without APHIS, it had not described how it would carry out such a program or to what extent Nevada would devote its resources to it. *Id.* at 1158. It was therefore possible that, without APHIS, Nevada would spend less on predator management or would implement control methods that were less harmful to the plaintiff's interests than those used by APHIS, such as aerial

14       WESTERN WATERSHEDS PROJECT V. GRIMM

hunting.  *Id.* at 1158–59.  Ultimately, we concluded that "[t]he notion that Nevada would replace everything APHIS [did was] speculative at best."  *Id.* at 1159.

Here, as in *WildEarth Guardians*, it is far from clear that, without Wildlife Services, IDFG would implement a program "entirely redundant" in its effect on Plaintiffs' interests.  *Id.* at 1158.  IDFG has stated in general terms that it has "independent capabilities to perform wildlife control activities" and agreements with independent contractors that it "has used and may use to perform lethal wolf control."  Even so, IDFG has not expressed an intent—or ability—to replace Wildlife Services' lethal wolf management operations completely.  The closest IDFG has come to indicating as much can be found in a single letter to Wildlife Services in which the writer states that, if Wildlife Services were unwilling to participate in wolf management for the protection of ungulates, IDFG would conduct its own wolf removal efforts for that purpose.  But that letter does not state that IDFG would independently carry out wolf killings to protect livestock or domestic animals—a significant component of Wildlife Services' existing wolf management activities in Idaho.  Nor does it explain IDFG's plans or demonstrate its capacity to compensate for the loss of federal services.  Indeed, the fact that Wildlife Services has carried out nearly all lethal wolf management in Idaho since 2011, partially through highly technical operations such as aerial hunting, suggests that IDFG may lack the expertise and resources to carry out those operations itself.  We therefore conclude that whether IDFG would implement an identical program without IDFG, thus resulting in the same number of lethal wolf removals, is a matter of speculation.  As we stated in *WildEarth Guardians*, "[s]uch speculation does not defeat standing."  *Id.* at 1159.

### III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's order dismissing this case for lack of standing and **REMAND** for further proceedings.